IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

# DOCKET NO. 13-14541-DD

## UNITED STATES OF AMERICA

Appellee

v.

## BOBBY MADISON

Appellant

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## INITIAL BRIEF OF THE APPELLANT
BOBBY MADISON

RANDEE J. GOLDER, P.A.
PO Box 243756
Boynton Beach, FL 33424-3756
(561) 503-4398

This case is entitled to preference as a criminal appeal

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 26.1-1, the following is a complete list of the trial judge, all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

| | |
|---|---|
| Adelstein, Stuart | (Trial Attorney for Co-Defendant Toriano Johnson) |
| Appellate Division, U.S. Attorney's Office | (Appellate Attorney for Plaintiff/Appellee) |
| Arencibia, Alejandro | (Victim) |
| Bank of America | (Victim) |
| Brink's, Inc. | (Victim) |
| Brown, Terrence | (Co-Defendant) |
| Cariglio, Gennaro, Jr. | (Trial Attorney for Co-Defendant Toriano Johnson) |
| Davis, Daryl | (Co-Defendant) |
| Dispoto, Mark | (Assistant U.S. Attorney for Trial) |
| Gilfarb, Michael | (Assistant U.S. Attorney for Trial) |
| Golder, Randee J. | (Trial/Appellate Counsel) |
| Linder, Jason | (Initial Assistant U.S. Attorney for Trial) |
| Madison, Bobby | (Defendant) |

C-1

Rosenbaum, Hon. Robin          (Trial Judge)

Salyer, Kathleen               (Appellate Attorney for Plaintiff/Appellee)

Wilfredo A. Ferrer             (U.S. Attorney)

United States of America       (Victim)

## STATEMENT REGARDING ORAL ARGUMENT

Appellant is requesting oral argument. The issues raised in this appeal concern factual and legal matters. Oral argument may be helpful to a full understanding of the issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT ............................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................ i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ............................................................. v

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

............................................................................. ix

Basis for Subject Matter Jurisdiction in Trial Court: ...................................... ix

Basis for Jurisdiction of Appellate Court: ................................................ ix

STATEMENT OF THE ISSUES .......................................................... 1

STATEMENT OF THE CASE .......................................................... 2

Nature of the Case .............................................................. 2

Course of the Proceedings and Disposition in the Court Below ...................... 2

Statement of the Facts............................................................ 3

Motion to Suppress Cell Phone Records ...................................... 3

The Trial ................................................................... 9

404(b) Robbery in 2005 ...................................................... 10

Madison's May 25, 2010 Arrest ............................................. 12

Attempted Robbery on July 26, 2010 .................................... 13

Attempted Robbery on September 17, 2010 ......................................... 15

Robbery on October 1, 2010.................................................................. 17

Madison's Testimony ........................................................................... 19

The Conspiracy..................................................................................... 22

Rule 29 Motions .................................................................................... 23

The Sentencing ..................................................................................... 23

Standards of Review ..................................................................................... 25

SUMMARY OF THE ARGUMENT .................................................................. 27

ARGUMENT.................................................................................................... 29

ISSUE 1:   Whether the defendant's cell phone records should have been
suppressed because the Government lacked sufficient grounds to obtain the
records?    29

ISSUE 2:   Whether it was error to allow the recorded post-arrest statement of
Hasam Williams to be used against Madison and refuse to give a limiting jury
instruction? ................................................................................................ 40

ISSUE 3:   Whether the court erred by computing the defendant's Sentencing
Guidelines using acquitted and uncharged conduct under the grouping
guidelines? 43

The Sentencing Guidelines .......................................................... 43

Constitutional Violations.............................................................. 45

ISSUE 4:    Whether the defendant's sentence is unreasonable? ................... 47

ISSUE 5:    Whether the court erred by failing to recuse itself after the

Government disclosed debriefing statements to the court in ......................... 54

violation of its agreement with the defendant not to use such statements

against the defendant? ...................................................................... 54

CONCLUSION ............................................................................... 57

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7) ............................ 58

CERTIFICATE OF SERVICE ............................................................. 59

# TABLE OF AUTHORITIES

**Cases**

Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978) .......................... 35, 36

Glasser v. United States, 315 U.S. 60 (1942) ..................................................... 25

Grunewald v. United States, 353 U.S. 391, 77 S. Ct. 963 (1957) .................... 42

Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317 (1983) .................................... 35

Jones v. United States, 362 U.S. 257, 80 S. Ct. 725 (1960) ............................... 34

Katz v. United States, 389 U.S. 347, 88 S. Ct. 507 (1967) .............. 30, 31, 32, 38

Madiwale v. Savaiko, 117 F.3d 1321 (11th Cir. 1997) ....................................... 36

Minnesota v. Carter, 525 U.S. 83,119 S. Ct. 469 (1998).................................... 30

Minnesota v. Olson, 495 U.S. 91, 110 S. Ct. 1684 (1990) ................................. 33

Pierce v. Underwood, 487 U.S. 552 (1988)......................................................... 26

Rehberg v. Paulk, 611 F.3d 828 (11th Cir. 2010)................................................ 30

Smith v. Maryland, 442 U.S. 735, 99 S. Ct. 2577 (1979) .................................. 31

U.S. v. Kapordelis, 569 F.3d 1291 (11th Cir. 2009)...................................... 35, 36

United States v. Allen, Docket No. 09-14444 (11th Cir. Jan. 31, 2011)............. 30

United States v. Barakat, 130 F.3d 1448 (11th Cir. 1997) ................................. 26

United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005) .................... 48, 49

United States v. Brown, 415 F.3d 1257 (11th Cir. 2005).................................... 26

United States v. Brundidge, 170 F.3d 1350 (11th Cir. 1999). ............................ 35

United States v. Castleberry, 116 F.3d 1384 (11th Cir. 1997) ........................... 41

United States v. Doherty, 233 F.3d 1275 (11th Cir. 2000)................................. 26

United States v. Exarhos, 135 F.3d 723 (11th Cir. 1998)................................... 25

United States v. Foster, 889 F.2d 1049 (11th Cir. 1989).............................. 56, 57

United States v. Hall, 46 F.3d 62 (11th Cir. 1995)............................................ 25

United States v. Harness, 180 F.3d 1232 (11th Cir. 1999)................................. 26

United States v. Irey, 612 F.3d 1160 (11th Cir. 2010) ....................................... 49

United States v. Jones, 565 U. S. ____, 132 S. Ct. 945 (2012) .............. 31, 32, 33

United States v. Keller, 916 F.2d 628 (11th Cir. 1990)................................. 25, 46

United States v. Lampley, 68 F.3d 1296 (11th Cir. 1995)................................... 41

United States v. Magluta, 418 F.3d 1166 (11th Cir. 2005) ........................... 41, 42

United States v. Nunnally, 249 Fed. Appx. 776 (11th Cir. 2007) ...................... 46

United States v. Pugh, 515 F.3d 1179 (11th Cir. 2008)...................................... 49

United States v. Range, 94 F.3d 614 (11th Cir. 1996)........................................ 26

United States v. Rita, 551 U.S. 338, 127 S. Ct. 2456 (2007) ....................... 26, 49

United States v. Starrett, 55 F.3d 1525 (11th Cir. 1995).................................... 25

United States v. Talley, 431 F.3d 784 (11th Cir. 2005)...................................... 49

United States v. Tokars, 95 F.3d 1520 (11th Cir. 1996)................................ 26, 41

United States v. Turner, 474 F.3d 1265 (11th Cir. 2007)................................... 26

United States v. Williams, 51 F.3d 1004 (11th Cir. 1995) ............................ 25, 26

United States v. Young, 115 F.3d 834 (11th Cir. 1997) ...................................... 25

**Statutes**

18 U.S.C. § 2703 (c) & (d) ........................................................... 32, 34

18 U.S.C. § 2703(c) .......................................................................... 34

18 U.S.C. § 2703(d) .......................................................................... 34

18 U.S.C. § 3231 ................................................................................ ix

18 U.S.C. § 3553(A) .................................................................. 49, 52, 54

18 U.S.C. § 3742(e) ........................................................................... 25

18 U.S.C. § 924(c) ............................................................................. 45

28 U.S.C. § 1291 ................................................................................ ix

**Other Authorities**

Lin Song, Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served* (Washington State Institute for Public Policy, Document No. 93-09-1201 Sept. 1993), available at http:// goldenspikerehab.com/docs/IncarcRecid.pdf ................................................. 53

**Rules**

FED. R. EVID. 801(d)(2)(E) .......................................................... 41, 42

**Constitutional Provisions**

U.S. CONST. amend. V ................................................................. 45, 46

U.S. CONST. amend. VI ................................................................. 45, 46

**Sentencing Guidelines**

U.S. SENTENCING GUIDELINES MANUAL §§3D1.2-3D1.5 (2012)........................ 44

U.S. SENTENCING GUIDELINES MANUAL §1B1.8(a) (2012)................................ 55

U.S. SENTENCING GUIDELINES MANUAL §1B1.8(b) (2012).......................... 55, 56

U.S. SENTENCING GUIDELINES MANUAL §2X1.1 (2012) .................................... 45

U.S. SENTENCING GUIDELINES MANUAL §3D1.1 (2012) .................................... 43

U.S. SENTENCING GUIDELINES MANUAL §3D1.1(a) (2012)................................ 44

U.S. SENTENCING GUIDELINES MANUAL §3D1.2 (2012) ............................. 44, 45

U.S. SENTENCING GUIDELINES MANUAL §3D1.3 (2012)................................... 44

U.S. SENTENCING GUIDELINES MANUAL §3D1.5 (2012) .................................... 45

U.S. SENTENCING GUIDELINES MANUAL §3D1.5 Illustrations of the Operation of

the Multiple-Count Rules (2012).................................................................... 44

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

### Basis for Subject Matter Jurisdiction in Trial Court:

This case came before the United States District Court pursuant to an indictment handed down by a federal grand jury charging the defendant with numerous violations of the Federal Criminal Code. The trial court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231.

### Basis for Jurisdiction of Appellate Court:

A written judgment of sentence was filed on September 30, 2013. DE941. This case comes before the appellate court pursuant to a Notice of Appeal timely filed on October 3, 2013 appealing that final order of conviction and sentence. DE943. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3231.

## STATEMENT OF THE ISSUES

Issue 1:    Whether the defendant's cell phone records should have been suppressed because the Government lacked sufficient grounds to obtain the records?

Issue 2:    Whether it was error to allow the recorded post-arrest statement of Hasam Williams to be used against Madison and refuse to give a limiting jury instruction?

Issue 3:    Whether the court erred by computing the defendant's Sentencing Guidelines using acquitted and uncharged conduct under the grouping guidelines?

Issue 4:    Whether the defendant's sentence is unreasonable?

Issue 5:    Whether the court erred by failing to recuse itself after the Government disclosed debriefing statements to the court in violation of its agreement with the defendant not to use such statements against the defendant?

1

## STATEMENT OF THE CASE

### Nature of the Case

The defendant was charged in a second superseding indictment with conspiracy to commit Hobbs Act robbery; attempted Hobbs Act robbery on July 26, 2010; attempted Hobbs Act robbery on September 17, 2010; and two counts of aiding and abetting the carry and use of a firearm in relation to a crime of violence for each of the two attempted robberies. DE262.

After being severed from co-defendants who were facing possible death penalty counts, the defendant proceeded to trial on July 31, 2012. DE208, DE346. On August 13, 2012, the jury returned its verdict convicting him of some counts and acquitting on the remaining counts. DE364.  The defendant was sentenced on September 30, 2013 with the written Judgment filed that same day. DE940-941.  A Notice of Appeal was filed on October 3, 2013. DE943.

This appeal was timely sought following the defendant's sentencing.

### Course of the Proceedings and Disposition in the Court Below

The defendant was arrested on March 2, 2012 pursuant to an arrest warrant. DE155.  The defendant has been incarcerated since the date of his arrest.

An initial appearance was conducted on March 5, 2012. DE150. That same day, the defendant entered a plea of not guilty to the superseding indictment that had been filed on March 1, 2012. DE144, DE152.

On July 31, 2012, jury trial commenced. DE346. The jury reached its verdict on August 13, 2012. The jury found the defendant guilty on some counts and not guilty on other counts. DE364.

The defendant was sentenced on September 30, 2013 to a total of 200 months in prison followed by five years of supervised release. DE940-941. The written Judgment was filed September 30, 2013. DE941.

The defendant's Notice of Appeal was timely filed on October 3, 2013. DE943.

## Statement of the Facts

### *Motion to Suppress Cell Phone Records*

Pretrial, the defendant filed a Motion to Suppress Cell Phone Records. DE198. The motion challenged the veracity and sufficiency of the Government's application for a court order authorizing them to receive the defendant's cell phone records. The cell phone records were critical at trial to corroborate the testimony of Nathaniel Moss, the lone cooperating witness.

3

In his Motion to Suppress, Madison pointed out that the *only* allegations about him to justify the order for phone records were:

1) "Law enforcement officers believe that subjects of the investigation used cellular telephone assigned the telephone number 754-234-7001 during the period from May 1, 2010, through and including February 1, 2011." [Page 2, Paragraph 2 of Application.]

2) "Sources have identified BOBBY RICKY MADISON as a person possibly involved in the armored car robbery that occurred on October 1, 2010. MADISON is also a known associate of MOSS and MOSS's other associates. From documents regarding a prior arrest of MADISON, the FBI has learned that MADISON uses a cellular telephone assigned the number 754-234-7001." [Page 5, Paragraph 3(m) of Application.]

3) "MADISON lives in the Opa Locka area near where MOSS resides. In May 2010, officers in the same Coconut Creek area from which the two stolen vehicles used in the October 1, 2010, robbery were stolen attempted to perform a traffic stop of a vehicle MADISON was driving. He led the officers on a high-speed car chase before eventually being apprehended. The car he was driving was report stolen from that same Coconut Creek area at approximately the same time of day as the two vehicles used in the October 1, 2010, robbery." [Page 5, Paragraph 3(n) of Application.]

DE198, pg. 2.

An evidentiary hearing was held on July 24, 2012. DE969. At that hearing, Madison testified that co-defendant Terrance Brown purchased the phone in the name of Madison's business, and both Madison and Brown used the phone. DE969:6-9.

The Government called Agent Starkey, the lead agent in the case, as its witness. DE969:10.

4

While the application for phone records claimed Madison lived in Opa-Locka near Moss, Agent Starkey admitted Madison used a mailing address in Miami, not Opa-Locka. He had no proof Madison ever lived in Opa-Locka or ever lived near Moss. DE969:38-39. At trial, Antonio Johnson testified as a Government witness. He confirmed Madison did *not* grow up in their Opa Locka neighborhood. He knew Madison only as someone who was occasionally at Toriano Johnson's barbershop. DE393:155-157.

Agent Starkey testified that they had Nathaniel Moss in custody as of October 1, 1998 and knew they were looking for at least two other individuals in connection with an attempted robbery of an armored car that day and the murder of a Brinks guard in connection with that attempted robbery. Later that day, law enforcement came into contact with Bobby Madison outside the residence of Terrance Brown. Brown was a "person of interest" in the attempted robbery. Agent Starkey claimed they knew Madison was a "known associate" of Brown and Moss (even though later evidence at trial showed that Madison was only friendly with Brown and did not associate with Moss).    DE969:12-13; DE392:184-5.

5

FBI agents confronted Madison as he was walking away from Brown's house. They wanted to examine Madison's cell phone, but Madison refused. DE969:13.

Agent Starkey claimed he received information around October 4th or 5th from a source he deemed credible that the person in the green hoodie who was involved in the October 1st robbery might be Madison. When Madison was interviewed within a week of October 1st, he claimed that he was in state court for a hearing that morning. The robbery/murder occurred around 11:30 a.m. and Madison's court hearing was scheduled for 8:30 a.m. Starkey claimed he verified the hearing was scheduled and knew state court hearings scheduled for the morning may go well into the afternoon but made no attempt to determine if Madison was actually in court that day. DE969:31, DE969:14-16. No warrant was issued for Madison's non-appearance and the hearing had not been reset. DE969:30-31. Meanwhile, the investigation progressed as to Moss and Brown.

Starkey claimed he got information from about three sources that Madison was a "known associate" of Moss and Brown but refused to disclose those sources. DE969:18. On cross, Starkey claimed that other agents investigating Moss's involvement in drugs told him Madison was an "associate" of Moss even

6

though Madison does not appear on any of the wiretaps, surveillance or any other evidence related to that investigation, and Madison was not indicted in that case. Starkey could not establish a reliable source for this information other than rumor being relayed by another agent. DE969:24-25.

Nathaniel Moss, the Government's star cooperating witness at trial, testified that Madison was never involved with Johnson's drug organization, and he never hung out with Madison. DE392:184-5.

According to Starkey, he could not completely clear Madison of involvement in the October 1st robbery based on the following: (a) Madison was a "known associate" of Moss and Brown; (b) Madison was seen at Brown's residence that evening; and (c) Moss and Brown were in the town of Coconut Creek, Florida at the time two cars used in the robbery were stolen and Madison had been arrested for stealing a car in Coconut Creek, Florida five months earlier. DE969:19-21. The prosecutor later clarified that the claim the cars were stolen from the same area in Coconut Creek was not accurate. The cars were just stolen in the town of Coconut Creek. DE969:59-60.

According to Det. Starkey, at the time the order for Madison's phone records was signed they had not cleared him of involvement in the October 1st

7

robbery. However, it is clear that Starkey deliberately hid material information from the court in his application for phone records and purposely failed to pursue exculpatory information.

Starkey eventually admitted that his only effort to either verify or refute Madison's known alibi of being in court at the time of the robbery was to check the state court docket to verify a hearing was scheduled. He filed the affidavit for a court order to obtain Madison's phone records without disclosing the possible alibi and without fully investigating a fact that would have proven his affidavit was false. DE969:32.

Furthermore, Starkey admitted that they have now firmly established that Madison was *not* the person in the green hoodie seen during the robbery attempt. DE969:24-25, 42. Even though Starkey claimed he had two "reliable" sources identifying Madison as the person in the green hoodie that he refused to identify, Starkey eventually admitted that both of those sources were *definitely wrong*. DE969:26-29.

The court entered the order allowing the Government access to Madison's cell phone records on February 2, 2011, and Agent Starkey admitted that just two days later, on February 4, 2011, he verified Madison's alibi – something he

could have easily done prior to submitting a false application to the court. DE969:45.

### The Trial

The second superseding indictment dealt with several attempted armed robberies and one actual armed robbery of armored cars at banks and the corresponding conspiracy to commit the crimes.

The Government's case relied heavily on the testimony of Nathaniel Moss, an alleged co-conspirator who had been previously convicted of participating in the October 1, 2010 robbery, and the person who shot and killed a Brink's guard during that robbery. Moss had a lengthy violent criminal history. He pled guilty in this case and was sentenced to life in prison. He testified in hope of getting a sentence reduction. DE392:163-164, 170-171, 189-194, 196.

Moss had a negative history with Madison. Moss's girlfriend was Iris Smalls who has a child fathered by Madison. Smalls lived in a location in Opa Locka where Moss and Johnson operated an illegal drug distribution organization. Moss was upset when he found out about Madison's relationship with Smalls through Terrence Brown. At one point around 2009, Madison described an incident in which Moss found out Smalls was sexually involved

9

with Madison and there was a confrontation. After that, Madison stayed away from Moss. DE392:174, 180-184, DE395:175-178.

The testimony of Moss was corroborated largely by the use of cell phone records and license plate readers.

<u>404(b) Robbery in 2005</u>

The court ruled that testimony about this robbery was admitted under Rule 404(b) and was not inextricably intertwined. A 404(b) instruction was given. DE392:177-179, 185-186; FED. R. EVID. 404(b).

Moss told the jury about a robbery in 2005 in West Palm Beach involving many of the same participants as charged in the indictment, including Madison. Moss said it was during the planning of this event at Johnson's barbershop that he first met Madison. DE392:23, 173-174

This robbery was planned by Terrence Brown and was similar to the October 1st robbery. This robbery involved Moss, Hasam Williams, Daryl Davis, Terrance Brown, Maurice, and Bobby Madison. Brown, Davis, and Maurice served as lookouts. Madison was the getaway driver – the one who drove the gunmen to the bank and drove them away after the robbery. Brown and Madison were to steal the vehicles used. Moss wore a disguise including a construction

10

vest provided by Daryl Davis. Moss and Hasam Williams were the gunmen. Moss held one guard at gunpoint while Williams disarmed the guard. Moss then grabbed the moneybag. The guard chased them as they fled. After fleeing the area they changed getaway cars and wiped down any fingerprints in the car they abandoned. DE392:84-96.

The Government called the guard who was robbed to testify at trial. The guard claimed he got a good look at the three people in the car that fled after he was robbed. He could not identify Madison as being in that car. DE393:20-28.

Moss claimed they shared the robbery proceeds with Toriano Johnson even though Johnson was in prison and could not participate. DE392:85, 98-100. Moss claimed some of the money from this robbery was used by Johnson to start an illegal drug business that was the subject of a separate prosecution. DE392:101.

Moss said the group was dormant from 2005 until 2010 because Terrence Brown was incarcerated during that time. DE392:102

11

Madison's May 25, 2010 Arrest

The Government called two Coconut Creek police officers and the car owner to testify about Madison's arrest on May 25, 2010 for stealing a red Honda Civic.

The owner testified to hearing the sound of her car horn around 3:00 a.m. Her husband looked out the window to find her car not there.  DE393:31. The officers testified to a high-speed chase that led to abandonment of the vehicle and the arrest of Madison. After arrest, Madison apologized to the officers and said he stole for his family because he was out of work. On Madison they found gloves, flashlight, and screwdrivers. DE393:38-58; Ex. 54a-c.

Moss testified that this attempt to steal a car was in preparation to rob a Brinks truck in Lighthouse Point. Moss claimed after Madison was arrested he could no longer be involved in stealing the cars to be used in the robberies. But apparently, Brown had no problem with Madison still participating in the robberies as a getaway driver or being present while Brown and Moss stole a car. DE392:105-7, 203-204.

12

At trial, Madison admitted he stole the car. He explained that he and Terrence Brown stole the car but it had nothing to do with any robbery. The cars he stole for Brown were taken to a chop shop. DE395:138-142, 147.

Terrence Brown and Toriano Johnson bonded Madison out after his arrest. DE392:203, DE393:185, 189-194.

<u>Attempted Robbery on July 26, 2010</u>

The first attempted armed robbery charged in the indictment occurred on July 26, 2010. It involved a Brink's armored car at the Bank of America located at 2850 Federal Highway in Lighthouse Point, Florida.

Moss claimed he got together with Madison, Daryl Davis, Hasam Williams, Toriano Johnson, and Terrence Brown after Brown got out of jail because they had previously been successful in committing such a robbery (referring to the 2005 robbery). DE392:102-104.

Madison got arrested for trying to steal a car to be used in this robbery (Madison's May 25th Arrest). After his arrest, Madison could no longer be involved in stealing cars, so Moss and Brown stole a burgundy Infiniti truck and a silver Camry to use in this robbery. DE392:105-107, 110.

13

They met at the home of Daryl Davis to organize and prepare to commit this crime. Johnson provided a gun. Hasam Williams wore a dress, and Daryl Davis did his makeup to make him look like a woman. Johnson provided them with bulletproof vests obtained from a police officer with the Opa Locka Police Department. DE392:113-120.

This bank happened to be right next to a tag reader that captured a vehicle used by the group during several surveillances prior to the robbery. DE392:124-125.

The day of the robbery they went to the bank, but the armored car never arrived. As they were leaving the bank, police spotted the stolen car Madison and Williams were in and followed. Madison and Williams fled in the car, eventually abandoning it in a nearby neighborhood. Moss claimed he saw Madison running through a plaza then go into a restaurant and then a Laundromat. Eventually, Brown picked up Madison. DE392:129-137, DE393:124-136 (Bell). Video from a nearby business captured someone running through the parking lot. Ex. 57a-c.

Williams was arrested during this episode for being a felon in possession of a firearm. His post-arrest interview was video-recorded. Ex. 59. Williams

14

claimed Jim picked him up at the Swap Shop and went to visit two girls. Then they rode around ending up in the area near the bank where the car was abandoned. He said Jim told him the car was stolen after the police started to follow them, and it was Jim who left the gun in the car when they jumped out and ran. During the interview, Williams can be seen wiping something off his face onto the inside of his shirt. DE393:86-101, 124-139.

After his arrest, Williams introduced Soldier to Brown as his replacement. The understanding was that after his arrest Williams could only participate as lookout, not robber. DE392:143.

Brown was upset with Madison and claimed Madison screwed up. DE392:140-141. Madison was not supposed to participate in any other robberies. Madison would get a cut for the previous things he did and because they had to help him out on his probation. The group met and all decided they did not want Madison as a participant in any other robberies. DE392:144, 224.

Attempted Robbery on September 17, 2010

The second attempted armed robbery occurred on September 17, 2010. It involved a Brink's armored car at the Bank of America located at 7950 Miramar

Parkway in Miramar, Florida. DE392:144. Madison was acquitted of this conduct at trial.

Moss claimed the participants in this attempt were: Moss, Madison, Soldier, Davis, Williams, Johnson, and Brown. Madison was still supposed to be the getaway driver. Moss and Soldier were to be the gunmen/robbers. Williams was only allowed to be a distant lookout. DE392:146-148, .

The group met for an organizational meeting at Daryl Davis's house. Williams could not make it because he was due in court, so he was replaced with Maurice. However, Williams did make it there in time to serve as a lookout. DE392:150-151.

There was an accident on the road near this bank on the day of the planned robbery. Police showed up at the scene of the accident. Because of the police presence, Madison did not want to go through with the robbery. Moss said Brown was mad when Madison abandoned the attempt and left the scene. The group decided to exclude him from any future endeavors. They would have given him a cut for his past activities but did not want him to participate in any future activities. Jermaine Parrish was brought in to replace Madison. DE392:151-156, 158-161, 211-212.

16

A video from the neighboring IHOP restaurant showed an SUV, Charger, and Miami-Dade work van driving through the bank parking lot. These were all vehicles Moss described as being used by the group during this planned robbery. DE392:155-157.

### Robbery on October 1, 2010

The third armed robbery alleged in the indictment occurred on October 1, 2010. It involved a Brink's armored car at the Bank of America located at 7950 Miramar Parkway in Miramar, Florida. Madison was not charged in any of the substantive counts related to this robbery.

Moss testified the participants in this robbery were:  Moss, Terrence Brown, Toriano Johnson, Daryl Davis, Hasam Williams, Jermaine Parrish, and "Soldier". DE392:10-11. Hasam Williams was supposed to participate as the second robber but was replaced by Soldier after he got into legal trouble. Williams and Davis served as lookouts. DE392:28. Daryl Davis's house was used for planning meetings and as a staging area to prepare for the robbery. DE392:68.

17

Moss and Brown stole a white Camry and a silver Honda Civic they used in this robbery. The cars were stolen from the Coconut Creek area. DE392:31, 57-59.

Moss wore a disguise consisting of a baseball cap, wig, jeans, beige Timberland boots, and an orange traffic safety vest provided by Daryl Davis. DE392:26, 68-69.   Brown drove Johnson's black Charger and directed the activities of the various participants. Johnson was in Parrish's black Chevy SUV and served as a lookout. Parrish drove Moss and Soldier to the location where the armored car was supposed to be and served as the getaway driver after the robbery. DE392:26-30. Both Moss and Soldier were armed. DE392:29.

The plan was to disarm the first guard. They anticipated the second guard would stay in the armored truck. But when Moss grabbed the first guard, the second guard got out of the truck and started shooting. Moss returned fire. Moss then threatened to shoot the guard he was holding if the second guard did not get back in the truck. The guard got back in the truck, then Moss shot the guard he was holding in the back of the head. After he shot the guard the getaway car left. Moss started running toward a second getaway car, but that car was also gone, so he assumed the others abandoned him. He tossed the traffic vest he was

18

wearing and buried the gun he used. DE392:35-47. Moss was arrested on October 1, 2010 and was facing the death penalty. Almost a year later, he pled guilty in exchange for a life sentence and began cooperating with the government. DE392:163-164.

Around June 2011, the gun was recovered based on information provided by Moss to law enforcement. DE393:106-108.

Moss confirmed Madison was not present for this robbery. DE392:31.

Later that day, agents observed Madison outside of Brown's house. Madison was approached at a bus stop after he left Brown's house. He was handcuffed and brought back to the residence for questioning. Madison possessed no contraband or weapons and was eventually released. DE393:198-213.

<u>Madison's Testimony</u>

Madison testified in his own defense. He admitted to 6 prior felony convictions for car theft and marijuana offenses and one conviction for dealing in stolen property, but he never served more than 98 days in jail. DE395:135-137.

19

He told the jury that he met Terrence Brown when he was 18 years old at Norwood Pool where Madison and Brown both worked as lifeguards. Madison considered Brown to be his best friend. Brown offered to set Madison up in business teaching children to swim. Daryl Davis also worked at Norwood Park. Madison knew Davis but did not consider him to be a friend. DE395:148-152, 154-155.

Brown obtained a cell phone for Madison and paid the bill. Brown used this phone frequently. Brown told Madison he wanted to use that phone so his wife would not see phone calls to other women. The phone was activated April 23, 2010 and was disconnected September 23, 2010. DE395:158-162.

Madison admitted stealing the car on May 25th. He said he stole it with Brown. They would usually take the cars they stole to a chop shop. DE395:138-142. As far as Madison knew, it had nothing to do with any robbery. DE395:147.

Madison denied being involved with car thefts on July 10, and he denied making phone calls listed for his phone around 2:00 p.m. on July 26. DE395:170-174.

Madison did not remember where he was on September 17, 2010 because nothing memorable happened that day. He denied being near the bank that the group planned to rob that day and denied driving any of the vehicles observed on police surveillance. DE395:174.

Madison claimed he did not know anything about the robberies until he showed up at Brown's house on October 1, 2010 and was questioned by law enforcement that day. He described the intimidating scene at Brown's house and admitted he was not truthful with law enforcement on that day. DE395:178-180.

He detailed his whereabouts that day including attendance at a court hearing in Ft. Lauderdale that did not end until about 10:30 a.m. He then checked in with Pretrial Services and left the courthouse about 11:30 a.m. After court, Madison went to a restaurant in Lauderhill where he ate and picked up lunch for the children. He used his girlfriend's car to pick his children up from the school bus stop and take them to their home. He returned the car to his girlfriend, then took the bus to Brown's house. Madison and Brown usually attended a local football game on Friday evenings. He then described the incident with law enforcement handcuffing and questioning him and the chaotic scene at Brown's house. DE395:181-192.

21

Madison described two meetings he had with Det. Starkey during which he provided a DNA sample and whatever information he had accumulated about what happened on October 1, 2010. DE395:156, 193-198.

Madison denied being involved in armored car robberies, denied being in the car with Hasam Williams the day Williams was arrested, denied ever carrying a gun, denied being with Brown and Moss when certain cars were stolen, and denied being with Brown and Moss at a WalMart store when items were purchased to steal a car for use in a robbery.[1] DE395:198-200.

The Conspiracy

Count 1 alleged a conspiracy to commit robbery by means of actual and threatened force, violence, and fear of injury that affected commerce and the movement of articles in commerce. The object of the robbery was alleged to be currency and property in the presence and custody of Brink's, Inc. The time period of the conspiracy is alleged to be May 2010 through October 1, 2010. DE262. This time period starts with Madison's arrest for car theft May 25, 2010

---

[1] Moss claimed Madison was present when Moss and Brown purchased gloves and tools used to steal a car and was present when they stole one of the cars, but Agent Starkey testified Moss never claimed Madison was present for these activities in any of his debriefings. DE395:75.

22

and ends with the October 1, 2010 robbery. The conspiracy was proven through evidence of the various robbery attempts including Moss's description of meetings of the various participants to plan each robbery attempt.

### Rule 29 Motions

A motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure was made at the close of the Government's case and renewed at the close of all the evidence. DE395:88-89, 280-281.

### The Sentencing

At sentencing, Madison objected to judicial fact-finding beyond the jury's verdict, and objected to being held responsible for acquitted and uncharged conduct under the grouping rules. If his objections had been upheld, his Sentencing Guidelines would have recommended a sentence of 51-63 months instead of the 200 months he received in this case. DE413.

At the sentencing hearing, the government agreed Madison did not participate in any meetings to plan the October 1st robbery nor did he help plan that robbery. DE980:9-10.

In holding Madison responsible for the October 1st robbery under the grouping rules, the court erroneously found that Madison was still minimally

involved even though he had been kicked out of the group. The court found that Madison knew they would again try to rob a Brinks truck, he was to be compensated for the past work that he did for the group, and he failed to take any action to stop the conspiracy from proceeding. DE980:30. The evidence did not support these findings. There was no evidence that Madison ever sought payment for past work for the group. There was evidence that Brown expressed a desire to pay Madison for his past work. The government admitted it had no evidence that Madison knew the group would commit the robbery on October 1st and was not involved with its planning. The judge did not hold Madison responsible for the death that occurred that day and gave him a minor role for that offense, but that does not overcome the lack of evidence that Madison had any participation in that offense.

At the sentencing hearing, Madison's attorney made clear she was preserving her objections to the use of acquitted and uncharged conduct in calculating his sentencing guidelines despite the court's rulings to the contrary. DE980:33-335.

There were other objections made and sentencing issues decided by the court, but those are not relevant to the issues raised on appeal.

**Standards of Review**

Questions of sufficiency of the evidence are reviewed *de novo* viewing the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469 (1942); United States v. Starrett, 55 F.3d 1525, 1541 (11th Cir. 1995); United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990).

The trial judge's findings of fact are reviewed for clear error. United States v. Hall, 46 F.3d 62, 63 (11th Cir. 1995); United States v. Exarhos, 135 F.3d 723, 729-30 (11th Cir. 1998), *citing*, United States v. Williams, 51 F.3d 1004, 1011 (11th Cir. 1995); United States v. Young, 115 F.3d 834, 836 (11th Cir. 1997).

"The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous … ." 18 U.S.C. § 3742(e).

The appellate court will review *de novo* the district court's application and interpretation of the Sentencing Guidelines. United States v. Harness, 180 F.3d

1232, 1234 (11th Cir. 1999); United States v. Barakat, 130 F.3d 1448, 1452 (11th Cir. 1997); United States v. Williams, 51 F.3d 1004, 1011 (11th Cir. 1995).

Sentences are reviewed for reasonableness. An appellate court may, but is not required to, presume a sentence within the properly calculated guidelines range is reasonable. United States v. Rita, 551 U.S. 338, 347-356, 127 S. Ct. 2456, 2462-2468 (2007).

Evidentiary rulings are reviewed for abuse of discretion. United States v. Brown, 415 F.3d 1257, 1264-5 (11th Cir. 2005); Pierce v. Underwood, 487 U.S. 552, 560-2 (1988); United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996); United States v. Tokars, 95 F.3d 1520, 1530 (11th Cir. 1996). If the defendant preserves his objection, any error is reviewed for harmlessness beyond a reasonable doubt, meaning the court would ask whether the properly admitted evidence of guilt was so overwhelming, and the prejudicial effect so insignificant, that beyond any reasonable doubt the improper use of the evidence was harmless. United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007); United States v. Doherty, 233 F.3d 1275, 1282 (11th Cir. 2000).

## SUMMARY OF THE ARGUMENT

The defendant's cell phone records were illegally obtained. The government submitted an affidavit in support of its request for the records to a magistrate judge who later would become a district judge and the same judge who ruled on the Motion to Suppress the records in the district court. While case law allows for this, the district judge had an interest in upholding her original order for the cell phone records to be produced. At an evidentiary hearing held on the Motion to Suppress those records, the defense established that the government went on a fishing expedition and really had no specific evidence allowing it to obtain the records. Furthermore, the government failed to inform the court of contrary information – an alibi – for Madison's whereabouts at the time of the offense, an alibi they knew about when submitting the application and confirmed just two days after seeking the records.

Madison also urges this court to evaluate the privacy interests at stake in the kind of cell phone data sought in this case and to apply a higher constitutional standard than the one set forth in the statute that controls the government's access to such records.

27

It was an abuse of discretion to admit the videotaped post-arrest statements of Hasam Williams as a co-conspirator statement and refuse to give a limiting instruction on use of this evidence against Madison. While the statement did not directly implicate Madison, the government was allowed to argue that they did implicate Madison indirectly. Madison objected and requested a limiting instruction that the judge refused to give. This evidence was not harmless. It served to partially corroborate the testimony of Nathaniel Moss, a witness with a violent criminal history and the person who killed a Brinks guard during one of the robbery attempts. The jury rejected much of Moss's testimony when it acquitted Madison on some counts, and only credited that part of Moss's testimony that was corroborated with evidence such as the videotaped statements in question.

The court erred when it calculated Madison's sentence under the grouping guidelines using acquitted and uncharged conduct. This was contrary to the clear wording of the grouping guidelines and resulted in a significantly higher advisory guidelines sentence. Madison also urges the court to find constitutional violations from using this conduct to compute his sentence.

28

Madison's sentence was above that recommended by the advisory guidelines and was unreasonable. Because the sentence was not within the advisory sentencing guidelines, it is afforded no presumption of reasonableness. The sentence was based on erroneously calculated sentencing guidelines that resulted in an unreasonably higher sentence than necessary to achieve the goals set for in 18 U.S.C. § 3553(a).

The court erred when it failed to recuse itself after the government violated a proffer agreement and disclosed to the court statements made by the defendant pursuant to a limited immunity letter agreement. While the court agreed to strike the offending filings, it failed to follow controlling case law that required the judge to recuse herself for the sentencing hearing.

## ARGUMENT

**ISSUE 1:** **Whether the defendant's cell phone records should have been suppressed because the Government lacked sufficient grounds to obtain the records?**

See *Statement of Facts: Motion to Suppress Cell Phone Records* above for the facts relevant to this argument and the establishment of false or materially incomplete information concerning the application for cell phone records.

29

It should be noted that the district judge who ruled on the Motion to Suppress on this issue was also the magistrate judge who issued the initial order for the cell phone records. *See* DE339 n.2. While that may not be contrary to existing law, it certainly gives the judge a personal interest in upholding the order for phone records that she herself issued.

Denial of a motion to suppress cell phone records is reviewed under a mixed standard. Findings of fact are reviewed for clear error and the application of law to those facts is reviewed *de novo*. United States v. Allen, Docket No. 09-14444, p. 9 (11th Cir. Jan. 31, 2011).

As a threshold, the court must first find the defendant had an expectation of privacy in the place searched or the item seized. Rehberg v. Paulk, 611 F.3d 828, 842 (11th Cir. 2010), citing, Minnesota v. Carter, 525 U.S. 83, 88, 119 S. Ct. 469, 473 (1998); Katz v. United States, 389 U.S. 347, 353, 88 S. Ct. 507, 512 (1967). "To establish a reasonable expectation of privacy, the person must show (1) that he manifested 'a subjective expectation of privacy' in the item searched or seized, and (2) a willingness by society 'to recognize that expectation as legitimate.'" Rehberg, 611 F.3d at 842.

The Supreme Court held that a defendant does not have a legitimate expectation of privacy in numerical information conveyed to a telephone company in the ordinary course of business, such as a listing of phone numbers dialed and calls received. Smith v. Maryland, 442 U.S. 735, 743-4, 99 S. Ct. 2577, 2582 (1979) (analyzing the expectation of privacy in a telephone pen register). However, there is a privacy right to the content of telephone conversations. *See* Katz v. United States, 389 U.S. 347, 88 S. Ct. 507 (1967). Cell phone usage was not common in 1979 when Smith v. Maryland was decided, and courts around the country are being asked to revisit this finding in light of the recent ways this data is being used by the government to track the movements and whereabouts of its citizens.

While the Supreme Court in Smith v. Maryland, *supra*, did not find a Fourth Amendment expectation of privacy in numerical call records such as a pen register, Congress disagreed to the extent it established a threshold before the government could obtain such records.

Recently, the Supreme Court held that installation of a GPS device on a car violated the Fourth Amendment. United States v. Jones, 565 U. S. ____, 132 S. Ct. 945 (2012). While Justice Scalia delivered the majority opinion of the

31

court basing its decision on the legal concept of trespass, Justice Alito's concurring opinion, joined by Justices Ginsburg, Breyer, and Kagan, raised the much larger issue of expectation of privacy in the digital age and the extent of government intrusion into privacy rights. Id. at 957.

Justice Alito made a relevant observation in his concurrence: "On the other hand, concern about new intrusions on privacy may spur the enactment of legislation to protect against these intrusions. This is what ultimately happened with respect to wiretapping. After Katz,[2] Congress did not leave it to the courts to develop a body of Fourth Amendment case law governing that complex subject. Instead, Congress promptly enacted a comprehensive statute [citation omitted], and, since that time, the regulation of wiretapping has been governed primarily by statute and not by case law." Id. at 962-3.

In this case, there is a statute controlling the Government's access to cell phone records: 18 U.S.C. § 2703 (c) & (d). That statute requires the Government to make a threshold showing before it can obtain a court order to get such records, but that showing is not as stringent as the showing needed under the Fourth Amendment.

---

[2] Referencing Katz v. United States, 389 U.S. 347, 88 S. Ct. 507 (1967).

32

The widespread usage of cell phones should cause re-evaluation of past precedent. Cell phones are now replacing landlines in many households. As Justice Alito noted: "… as of June 2011, it has been reported, there were more than 322 million wireless devices in use in the United States." <u>Jones</u>, 132 S. Ct. at 963. This nearly matches the total population of the United States. At some point, the courts must recognize a person's privacy interest in not having their whereabouts tracked by the government.

As a threshold matter, the court determined that Madison did have an expectation of privacy in his cell phone and had standing to contest the production of those cell phone records. DE339:11. Madison had personal information in his cell phone that he refused to share with law enforcement on October 1st at Brown's house. Merely sharing the use of the phone with Brown did not waive that expectation of privacy.

Courts have long recognized joint privacy interests. In <u>Minnesota v. Olson</u>, 495 U.S. 91, 110 S. Ct. 1684 (1990), the Supreme Court held that Olson, a guest of two women in a home, had an expectation of privacy in that home, and his warrantless arrest in the home was illegal and statements made subsequent to arrest were suppressed. In <u>Jones v. United States</u>, 362 U.S. 257,

80 S. Ct. 725 (1960), the Supreme Court recognized the privacy interest of Jones who had been temporarily staying at his friend's apartment overnight but maintained his own residence elsewhere.

In this case, the Government sought a court order for authorization to obtain electronic communication service records, including cell site location data. That request is governed by 18 U.S.C. § 2703 (c) & (d). 18 U.S.C. § 2703(c) authorizes the Government to obtain electronic communication service records (excluding the contents of communications) by obtaining a court warrant or order. 18 U.S.C. § 2703(d) authorizes a court of competent jurisdiction to issue an order requiring disclosure of communications service records *if* the Government "offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

The Government failed to provide specific and articulable facts that show reasonable grounds to believe the specific telephone in question was relevant and material to an ongoing criminal investigation.

"Probable cause to support a search warrant exists when the totality of the circumstances allows the conclusion that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" U.S. v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009), citing, Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317 (1983); United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).

The law concerning misrepresentations in search warrant applications is analogous and applicable in this case.

"In order to be entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit, a defendant must make a substantial preliminary showing that the affiant made false statements, either intentionally or with reckless disregard for the truth, pointing specifically to the portions of the affidavit claimed to be false, and that the false statements were necessary to the finding of probable cause." Kapordelis, 569 F.3d at 1309, referencing, Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674 (1978).

Madison made this showing and an evidentiary hearing was held. At that hearing, disturbing facts came out about the failure to include information about

35

the defendant's alibi at the time of the robbery and misrepresentations about the defendant's vague association with suspects at the time.

"[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997). The court is instructed to look only at the remaining portions of the application after omitting the false information to determine whether there is still probable cause. Kapordelis, 569 F.3d at 1309; Franks, 438 U.S. at 171-2, 98 S. Ct. at 2674.

In this case, there was no probable cause or reasonable grounds after removal of the false allegations. Once it was established the Government had *no* evidence or information linking Madison to the October 1st robbery, the Application was totally void of any probable cause to search the phone records.

The trial court erred by denying the motion to suppress. This error was not harmless. The cell phone records were the primary corroborating data for the testimony of Nathaniel Moss, a witness of dubious character and credibility without such corroboration. There was little else connecting Madison to any of these crimes. Nathaniel Moss was the actual killer of a Brinks guard during the October 1st robbery. He had a very violent criminal history. And he had strong

36

motivation to lie to avoid a possible death sentence in this case. Looking at the final verdict, it is clear the jury only convicted where there was substantial corroboration of Moss's testimony. Where such corroboration was lacking, the jury acquitted. So this error was certainly not harmless.

The district judge made an extensive finding in her order [DE339] supporting the warrantless seizure of anything in the airwaves. Contrary to her finding, most people have no idea how cell phones work and do not implicitly consent to seizure of information transmitted through airwaves. Cell phone data is not readily accessible to the general public. It takes special equipment to capture and decipher information transmitted through airwaves. More and more, we as a society are reliant on wireless communication. By taking advantage of this technology, we are not waiving our privacy interests in the information transmitted through such means. Cell sites are not only used to transmit the phone numbers dialed and the phone numbers of those calling us, the actual content of the communication is transmitted in the same way through the same technology. The court's broad finding that citizens waive their privacy rights to all data transmitted through the airwaves would subject the content of phone

37

calls as well as the data to warrantless government seizure. This is contrary to the finding in <u>Katz</u>.

Courts around the country are now grappling with the privacy concerns revealed by the Edward Snowden disclosure of the government seizing all kinds of electronic data about people without a warrant. The subsequent uproar over these revelations indicates our society is not willing to ignore privacy interests in these areas. If the court were to recognize Madison's privacy interest in his cell phone data, then a higher Fourth Amendment standard is applicable.

Of note in the court's order denying the Motion to Suppress is the judge's finding that the government's application did misrepresent the defendant's proximity to Moss in Opa Locka. DE339:11. However, the court's reasoning that Madison's theft of a car from the town of Coconut Creek five months before the robbery somehow provides a reasonable suspicion that he was involved in the robbery on October 10th, 2010 is more than a stretch. And simply because the government believed there was a fourth perpetrator of the robbery does not establish the requisite level of suspicion to allow them to seize and search Madison's electronic data. Under that theory, everyone who was ever associated with Moss and Brown would be subject to search.

38

What makes this seizure particularly egregious is that the government was in possession of information establishing an alibi for Madison at the time of the offense – information they confirmed just two days after applying for the records warrant, and information they failed to disclose to the court. The judge failed to address this withholding of material information when she ruled on the Motion to Suppress.

The government went on a fishing expedition in this case. They should not be allowed to violate a citizen's privacy rights based on allegations of mere association. While Madison's records were obtained in violation of a statute requiring the government to show reasonable suspicion, it is impossible to know how many others may have had their rights violated by illegal seizure of their phone records. Through a web of sealed filings and the government's broad data collection practices, it is impossible to know if there are others who were not charged in this case who were subject to having their person electronic data illegally seized and scrutinized. What is clear is that Madison's records were seized without even the small level of reasonable suspicion required by the controlling statute.

**ISSUE 2:**    **Whether it was error to allow the recorded post-arrest statement of Hasam Williams to be used against Madison and refuse to give a limiting jury instruction?**

The video-taped interview of Hasam Williams following his arrest on July 26, 2010 was admitted into evidence. Trial Ex. 58. The court denied Madison's request for a jury instruction limiting the use of such evidence against him. DE395:7-11.

During the interview, Williams said he was with "Jim" who picked him up at the Swap Shop. They went to visit two different women at two different locations. Williams said he was not familiar with the area and could not say where the houses of the women were located. Then he described getting food at McDonald's and ending up near the bank where a tag reader flagged the vehicle as stolen. He admitted to fleeing the area.

While Williams did not implicate Madison directly in his statement, use of the video was intended to corroborate the testimony of Nathaniel Moss.  In the video, Williams can be seen wiping something off his face onto the inside of his shirt. Moss had testified that Williams was dressed as a girl that day for the attempted robbery. The shirt that Williams was wearing at the time was not in

40

evidence, so there was no ability to identify what Williams wiped from his face onto the shirt.

The court admitted the post-arrest interview of Hasam Williams under FED. R. EVID. 801(d)(2)(E), which states in pertinent part:  "A statement that meets the following conditions is not hearsay: … The statement is offered against an opposing party and: … was made by the party's coconspirator during and in furtherance of the conspiracy. FED. R. EVID. 801(d)(2)(E).

The determination of whether a statement was made during the course and in furtherance of a conspiracy is a determination of fact that will be disturbed on appeal only if clearly erroneous. United States v. Castleberry, 116 F.3d 1384, 1391 (11th Cir. 1997); United States v. Lampley, 68 F.3d 1296, 1300 (11th Cir. 1995); United States v. Tokars, 95 F.3d 1520, 1538 (11th Cir. 1996).

In this case, the statement was made to law enforcement post-arrest. It was not in furtherance of the conspiracy.

In United States v. Magluta, 418 F.3d 1166 (11th Cir. 2005), an undercover agent approached a juror who had been bribed in a prior trial. Believing the agent to be a colleague of the defendant, the juror assured him he would not tell anybody about the bribe. This statement was introduced under

Rule 801(d)(2)(E). The Eleventh Circuit, citing <u>Grunewald v. United States</u>, 353 U.S. 391, 77 S. Ct. 963 (1957), held that this was error. The juror's statement was not in furtherance of the conspiracy even though the cover-up was still ongoing because all objects of the conspiracy had been achieved. 418 F.3d at 1177-79.

In <u>Grunewald</u>, the Supreme Court held that:  "[A]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." 353 U.S. at 401-2, 77 S. Ct. at 972.

In this case, by the time Williams provided his statement to law enforcement, any attempt to rob the Brinks truck on July 26th had been abandoned. At that point, there was no plan to commit any additional robberies. So Williams's statements and actions in the video were not intended to cover up an ongoing conspiracy. They were merely to hide from law enforcement the true purpose of why Williams was in the area at the time of his arrest. These statements were erroneously allowed to be used to imply guilt by Madison. This

42

was an improper use of the video, and the court should have, at a minimum, given a jury instruction limiting the use of such testimony.

**ISSUE 3:**   **Whether the court erred by computing the defendant's Sentencing Guidelines using acquitted and uncharged conduct under the grouping guidelines?**

The defendant's Sentencing Guidelines were calculated using a crime never charged by a grand jury nor found by a trial jury and by using acquitted conduct. This resulted in a 3-level increase to the defendant's sentencing guidelines calculation. PSI:12-13.

The defendant was never charged with the October 1, 2010 robbery and was acquitted of the September 17th robbery.

At the end of the sentencing hearing, the defense preserved all of the objections previously made including the use of uncharged and acquitted conduct and a sentence above the advisory guidelines range. DE980:72.

*The Sentencing Guidelines*

Looking at the Sentencing Guidelines, U.S.S.G. §3D1.1 by its clear language applies to counts of *conviction*. It states: "When a defendant has been *convicted* of more than one count, the court shall: (1) Group the counts *resulting in conviction* into distinct Groups of Closely Related Counts ("Groups") by

43

applying the rules specified in §3D1.2; (2) Determine the offense level
applicable to each Group by applying the rules specified in §3D1.3. (3)
Determine the combined offense level applicable to all Groups taken together by
applying the rules specified in §3D1.4." U.S. SENTENCING GUIDELINES MANUAL
§3D1.1(a) (2012) (emphasis added).

While the text of U.S.S.G. §§3D1.2-3D1.5 is silent as to whether only
counts of conviction should be considered, the *Illustrations of the Operation of
the Multiple-Count Rules* contained in §3D1.5 clearly refers to counts of
conviction. U.S. SENTENCING GUIDELINES MANUAL §3D1.5 Illustrations of the
Operation of the Multiple-Count Rules (2012).

There is nothing in the grouping guidelines that allows grouping
enhancements for acquitted or uncharged conduct. Yet Madison's guidelines
were enhanced by three levels specifically for acquitted and uncharged conduct
based on the jury convicting him of the conspiracy. However, the clear intent of
the language in the grouping rules is that they apply to the substantive offenses
of conviction. The examples given at the end of U.S.S.G. §3D1.5 indicate the
grouping rules look at the substantive offenses of conviction. In U.S.S.G.
§3D1.2(d) it lists offenses covered by the grouping guidelines, and the guideline

44

for conspiracies – §2X1.1 – is not listed. U.S. Sentencing Guidelines Manual §3D1.2(d), §3D1.5, and  §2X1.1 (2012).

Looking at the guideline calculation in the Presentence Investigation Report, Madison was only convicted of the Group One offenses. PSI:11. This calculation resulted in an adjusted offense level of 22, which would result in a recommended sentence of 51-63 months in prison. A five-year consecutive sentence would be added for the 18 U.S.C. § 924(c) conviction. This should have resulted in a top-of-the-guidelines recommended sentence of 123 months. This is far lower than the 200-month sentence imposed.

### Constitutional Violations

Punishment was based on a crime never charged nor proven to a jury. This violates the Presentment and Due Process Clauses of the Fifth Amendment, and the Sixth Amendment right to jury trial.

The Presentment Clause states:  "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury …" U.S. Const. amend. V. "A fundamental principle stemming from this amendment is that a defendant can only be convicted for a crime charged in the indictment." United States v. Nunnally, 249 Fed. Appx. 776, 778

45

(11th Cir. 2007), *citing*, <u>United States v. Keller</u>, 916 F.2d 628, 633 (11th Cir. 1990).

The Due Process Clause states:  "… nor be deprived of life, liberty, or property, without due process of law; …" U.S. CONST. amend. V.

The Sixth Amendment states in pertinent part:    "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; …" U.S. CONST. amend. VI.

The "no person shall be held to answer" language of the Presentment Clause along with the Due Process language that bars taking away someone's liberty without due process implies that no person shall be punished for a crime unless he was indicted for that crime by a grand jury.

In this case, Madison was never indicted nor charged with the October 1st robbery. Yet he has been punished for it. The evidence showed that Madison was kicked out of the group before this robbery took place and was replaced with Jermaine Parrish.

46

The Sixth Amendment right to jury trial was intended to ensure that one is found guilty of the crime charged before punishment can be imposed. To punish someone for a crime neither charged nor found by the jury violates all three Constitutional provisions.

While this court has allowed use of acquitted conduct in consideration of punishment, the defendant maintains that such routine use violates the defendant's Sixth Amendment right to have a jury determine his guilt.

In addition, the court lacked sufficient evidence to hold Madison responsible for what happened on October 1st. Madison was kicked out of the group prior to the planning of this offense. He was not involved with the planning of the offense. And there was no evidence that Madison expected to receive proceeds from this robbery. There was no evidence Madison was even aware this offense was occurring or about to occur.

**ISSUE 4:**    **Whether the defendant's sentence is unreasonable?**

Madison's Sentencing Guidelines were calculated to be criminal history category III and adjusted offense level 28. This calculation included a 3-level enhancement based on grouping of an acquitted robbery and an uncharged robbery including adjustment for the gun possessed in the acquitted robbery.

47

Madison also received a two-level enhancement for obstruction of justice. This resulted in a recommended sentencing range of 97-121 months before application of the 924(c) consecutive five-year minimum mandatory. Madison received a sentence of 200 months consisting of 140 months for the three attempted robberies and a consecutive 60 months for the 924(c) firearm count. PSI:10-13, 17, 24; DE941.

This sentence was above the recommended sentencing guidelines range and is, therefore, afforded no presumption of reasonableness. Furthermore, if the guidelines had been properly calculated by not applying the grouping rules to acquitted and uncharged conduct, Madison's sentencing range would have been 51-63 months. A 60-month consecutive sentence is required to be added, resulting in a top-of-the-guidelines recommendation of 123 months.

At sentencing, Madison objected to imposition of a sentence above the advisory guidelines range. DE980:72.

The sentence imposed by the district judge can be reviewed on appeal for reasonableness. United States v. Booker, 543 U.S. 220, 261-263, 125 S. Ct. 738 (2005). There is no presumption of reasonableness if the sentence is outside the

48

properly calculated sentencing guidelines range. Rita v. United States, 551 U.S. 338, 127 S. Ct. 2456 (2007).

"… [W]e recognize that our substantive review of sentences is deferential and that we only look to see if the district court abused its discretion by committing a clear err in judgment." United States v. Irey, 612 F.3d 1160, 1165 (11th Cir. 2010).

The Eleventh Circuit stated:  "Booker further held that in performing this review, we must measure 'reasonableness' against the factors outlined by Congress in 18 U.S.C. § 3553(a). United States v. Pugh, 515 F.3d 1179, 1188-9 (11th Cir. 2008), referencing Booker, 543 U.S. at 261, 125 S. Ct. 738.

"Booker instructs us that not only must district courts apply the § 3553(a) factors in making their sentencing decisions, but courts of appeals also must apply those same factors in determining whether a sentence is reasonable." Irey, 612 F.3d at 1184.

The burden of establishing that a sentence is unreasonable lies with the party challenging the sentence. Pugh, 515 F.3d at 1189, referencing United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).

18 U.S.C. § 3553(a) requires the court to consider:

49

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

        (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be

incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be

51

incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[1]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Sentencing Guidelines already take into account the seriousness of the offense and the need for deterrence.

There was nothing inherently violent about Madison's conduct. He was not the gunman for any of the robberies. That is not to understate the violent nature of the offense overall. But Madison's role was always that of a getaway driver. He was never to be the person assaulting or robbing someone. So there is nothing in particular about Madison's conduct that is not already considered by the Sentencing Guidelines.

Madison's criminal history consisted primarily of crimes related to car thefts and personal use of marijuana. There was one brief period in 1997-1998

52

where Madison was involved with selling drugs, but he had discontinued that conduct long ago. The defendant's football injury at age 16 and the loss of his mother in 2003 had a major impact on his life. In addition, his father was an invalid. So Madison lacked a male role model. Unfortunately, he was befriended by Terrence Brown who offered to back him in teaching swimming and lured him into this offense.

In this offense, Madison was actually kicked out of the group for getting cold feet and backing out of the offense. This is an indication of someone who is capable of rehabilitation.

Studies have shown that the likelihood of recidivism increased with the length of the sentence for non-violent offenders. *See* Lin Song, Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served* (Washington State Institute for Public Policy, Document No. 93-09-1201 Sept. 1993), available at http:// goldenspikerehab.com/docs/IncarcRecid.pdf.

Prior to this case, Madison had never spent more than 6 months in jail. He had never been sentenced to prison. He had never been offered any rehabilitation education or treatment. There were many kinds of sentences

53

available to the court other than an above-guidelines sentence, but the court gave no indication of taking those options into account.

The court never evaluated the considerations in § 3553(a)(2)(D) concerning educational, vocational, and other correctional treatment. Instead, the court chose the most onerous sentence and one that exceeded the guidelines recommendation. This sentence was unreasonable.

**ISSUE 5:** **Whether the court erred by failing to recuse itself after the Government disclosed debriefing statements to the court in violation of its agreement with the defendant not to use such statements against the defendant?**

After conviction but before sentencing, the prosecutors agreed to meet with Madison to discuss information he may have of value to the Government. This meeting was conducted pursuant to the terms of a Proffer Letter Agreement. At the beginning of the meeting, defense counsel had extensive discussions with the prosecutor about the terms of the Agreement and was given assurances that Paragraph 6 of the Agreement protected Madison against having any of his statements used substantively against him at sentencing unless he opened the door by affirmatively disputing certain matters. Madison did not affirmatively dispute any factual matters that would allow the Government to use his statements substantively against him.

54

The Proffer Agreement can be found attached to Madison's Motion to Strike Government's Response to Motion for Continuance for Violation of Proffer Agreement. DE470.

Paragraph 6 of the Agreement stated in relevant part: "The United States may also use his statements as rebuttal evidence, regardless of whether he testifies or not, and for the purpose of sentencing as provided for, *and limited by*, Sections 1B1.8(a) and (b) of the United States Sentencing Guidelines." [Emphasis added.]

U.S.S.G. §1B1.8(a) states: "Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, *then such information shall not be used in determining the applicable guideline range*, except to the extent provided in the agreement." [Emphasis added.] U.S. SENTENCING GUIDELINES MANUAL §1B1.8(a) (2012).

U.S.S.G. §1B1.8(b) allows for use of the information provided by the defendant under certain limited circumstances, such as if it was known to the

55

government prior to the defendant's debriefing or if the defendant first breaches the Agreement. It can also be used to prosecute for perjury or to determine the extent of a downward departure under §5K1.1 (substantial assistance). U.S. SENTENCING GUIDELINES MANUAL §1B1.8(b) (2012). None of those exceptions were present in this case.

The government breached the terms of this Agreement by submitting information from the proffer to the trial court in Paragraphs 5, 6, and 7 of the Government's Response to Motion for Continuance [DE468], and Paragraph 2 of the Government's Position Statement on Sentencing [DE469]. This information was submitted for use against the defendant at sentencing.

The court entered a paperless order at DE475 granting in part and denying in part Madison's Motion to Strike the documents from the record and recuse the judge. The court ordered the documents stricken from the record (although the documents remain on the docket sheet to this date) but denied the request for the judge to recuse herself from further proceedings.

In United States v. Foster, 889 F.2d 1049 (11th Cir. 1989), a case directly on point, the Eleventh Circuit held that the offending documents must be stricken from the record and the case assigned to another judge for sentencing.

56

In <u>Foster</u>, the defendant was found guilty at trial and then entered into an agreement with the Government to provide information. The agreement stated that none of the information could be used against the defendant. Notwithstanding the agreement, the government disclosed information obtained through the debriefing to the probation office, and this information was incorporated into the defendant's presentence investigation report. The information showed the defendant had a greater involvement in the crime than was found at trial. The Eleventh Circuit held that the offending filings should be stricken from the record and the case should be assigned to a different judge for sentencing. <u>Id.</u> at 1056.

This case is indistinguishable from <u>Foster</u>. The judge should have recused herself from the sentencing.

## CONCLUSION

Appellant is requesting the following relief from the court:

As to Issue 1, this court should order hold that the records should have been suppressed and a new trial should be granted.

As to Issue 2, a limiting jury instruction should have been given and a new trial should be granted.

57

As to Issues 3 and 4, the defendant's sentence should be vacated and the case remanded for re-sentencing.

As to Issue 5, the defendant's sentence should be vacated and the case remanded for re-sentencing before a different judge.

_____
Randee J. Golder, Esq.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

The Appellant hereby certifies that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7) because it contains 11,201 words and 1,031 lines according to Microsoft Word 2008 for Mac, excluding the parts of the brief exempted by 11th Cir. R. 32-4.

_____
Randee J. Golder, Esq.

58

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has

been furnished by U.S. Mail to:

Appellate Division
U.S. Attorney's Office
99 N.E. 4th St.
Miami, FL  33132

on this _____ day of May, 2014.


_____
Randee J. Golder, Esq.